## In re Anonymous No. 9 D.B. 80

Disciplinary Board Docket no. 9 D.B. 80.

NEUMAN, *Board Member,* March 13, 1981 —

## I. HISTORY OF PROCEEDINGS

On February 22, 1980, a petition for discipline was filed by petitioner charging respondent with failure to settle an estate in a timely manner. Respondent was specifically charged with violating D.R. 6-101(A)(3), 7-101(A)(1), 7-101(A)(2), and 7-101(A)(3). The case was referred to a hearing committee.

The hearing committee, using the abbreviated procedure, found respondent had violated D.R. 6-101(A)(3): "A lawyer shall not: . . . Neglect a legal matter entrusted to him," and recommended an "Informal Admonition."

Both sides agreed to the abbreviated procedure. Determination of the hearing committee was not accepted by respondent, and after the finding counsel for respondent requested that a formal report of the hearing committee be made.

The report of the hearing committee was filed with the Disciplinary Board for review. After reviewing the history of the case, the Disciplinary Board rejected the recommendation of the hearing committee and agreed unanimously that the case against respondent be dismissed.

## II. FINDINGS OF FACT

Respondent is an attorney admitted to practice law in the Commonwealth of Pennsylvania.

On April 7, 1977, the grandfather of respondent (hereinafter "decedent") died testate, and on April 13, 1977 decedent's children, the uncle of respondent, and mother of respondent, petitioned the Register of Wills of [   ] County for Letters Testamentary. Letters Testamentary were granted to respondent's uncle and respondent's mother on April 13, 1977, as co-executors of the estate.

Respondent was retained to represent his mother and respondent's uncle also retained an attorney.

Disciplinary counsel charged in the petition for discipline filed on February 22, 1980 that respondent's uncle hired his attorney at the time of decedent's death, and the report of hearing committee states that the attorney for respondent's uncle was hired approximately three months after decedent's death. Although respondent's uncle initially testified before the hearing committee that he did not hire his attorney until three months after his father's death, he later admitted that he had earlier retained the same attorney in 1975 after his mother's death. This was confirmed by respondent's attorney in testimony before the hearing committee.

The issues in this case go back prior to the estate in question to 1975 when respondent's mother and uncle were appointed guardians of their father's estate. Their mother had died, her assets became part of their father's estate, and the guardianship was established because the father was declared incompetent.

Respondent's uncle lives in Florida and became upset over the handling of the guardianship, especially checks that had been signed by his sister that were drawn on the father's estate. These checks subsequently were proven to have been amounts used to meet the father's expenses. Throughout the period subsequent to the father's death respondent's uncle continued to argue over issues he had raised during the guardianship, and did not seem able to separate the guardianship matters from those that he raised about the estate after decedent's death.

Disciplinary counsel charged in its petition for discipline on February 22, 1980 the following: "Be-

tween April, 1977 and July 31, 1978 respondent took no reasonable action towards effecting a settlement and distribution of the assets of the decedent's estate. . . ." The hearing committee found otherwise, noting "by September of 1978, there was nothing for Respondent as attorney for the Estate to do." Exhibits and testimony suggested such a conclusion could have been drawn by the hearing committee because of the uncle's refusal to sign documents and return them, as well as his insistence that questions he had regarding the guardianship and the estate had not been answered to his satisfaction.

Although the hearing committee reported that respondent's uncle was willing to cooperate starting in April of 1978, documents filed with the case suggest otherwise. For example, on May 23, 1978 respondent's uncle wrote his attorney the following:

"I have just finished signing the estate papers and will send them tomorrow by insured mail, to you, you can do with them whatever you like. Do you think it would be a good idea to hold them until [Respondent] agrees to pay your fee out of the estate? If you want to stall on handing the papers over to [Respondent] you can say that I didn't send them yet, I did not date the papers, that is, my signatures, so he won't know when they were signed. . . . I suggest you get your fee situation straightened out with the estate before turning over the papers. . . ."

From February 1978 through June 1978, the attorney for respondent's uncle tried to get respondent's uncle to sign and return papers that had been sent to him. They were finally signed and filed July 31, 1978. The papers included those required to

close out the guardianship estate as well as others relating to decedent's estate.

Although the hearing committee found that from September 1978 until April 1979 "not one thing was done to proceed with the case," discussions during this period were held between respondent and his uncle's attorney on the subject of how to handle closing of the estate, and correspondence and documents were sent by the uncle's attorney to the respondent's uncle on February 26, 1979.

Correspondence from respondent's uncle as well as testimony from the uncle's attorney and respondent indicate the delays in settling this estate had more to do with the uncle's refusal to cooperate than delays on the part of respondent. For example, on April 28, 1979 the uncle wrote his attorney the following:

"Received the copy of the First and Final Account which you forwarded to me this week. . . .

"If I sign this release does it mean that I accept and agree to everything that has transpired in relation to the estate business? Does it mean that I forfeit all opportunities of charging [Respondent] with any wrongdoings?

"If I sign this release does it, in any way, jeopardize the charges that are pending against him with the Pennsylvania Bar Association, which the Bar Association recently assured me are very active? . . ."

The estate, which, according to the inventory filed on July 31, 1978 had a clear value subject to taxation of $36,375.75, was settled in October of 1979.

## III. DISCUSSION

The complaint against respondent was brought

by his uncle and is an unfortunate matter of a disgruntled family member against another family member. Letters written by the uncle included in exhibits filed with the hearing committee indicate the uncle's antagonism toward his father, his sister, as well as his nephew.

As noted above, delays in this case were in large part due to a failure of respondent's uncle to cooperate. As the uncle's attorney wrote respondent on May 7, 1979: "I do not think [Respondent's uncle] is capable of being satisfied by any reasonable explanations. His distrust is paranoic. Under the circumstances I think it would be a waste of time to get [respondent's uncle] to agree with anything. . . . I believe we should simply file an Account and let the Orphans Court resolve the many 'wrongdoings' that [respondent's uncle] is certain exist."

Apparently there was no clear understanding between respondent and his uncle's attorney of how the work would be divided in the handling of the estate. The attorney for respondent's uncle indicated in testimony that he understood respondent would do the paperwork and he would serve as an intermediary with the uncle. Respondent indicated in testimony that he believed his uncle's attorney would share in the work since he would receive half of the fee. Respondent's uncle at one point also expressed some dissatisfaction with his attorney's representation of him in correspondence written in March 1979 which refers to letters and telephone calls not answered or returned by the uncle's attorney.

Given the uncle's attitude it is difficult to determine how respondent could have expedited settlement of the estate. Although disciplinary counsel suggests respondent could have taken himself off the case, respondent was representing one, not

both, of the co-executors, and there is no evidence to suggest his client was dissatisfied with respondent's handling of the estate.

Because of the circumstances of this case and the lack of evidence indicating willful failure on the part of respondent to execute settlement of the estate, the Disciplinary Board has concluded that no violations of the Disciplinary Rules of the Code of Professional Responsibility have occurred and the complaint should be dismissed.

## ORDER

HENRY, *Chairman,* And now, February 13, 1981, the report and recommendation of the hearing committee is rejected; and it is ordered and decreed, that the petition for discipline docketed at no. 9 D.B. 80 is hereby dismissed.